UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ALFRED H. DAVIS, Derivatively on Behalf of PLAINS ALL AMERICAN PIPELINE, L.P., | § § § | |
| | § | Civil Action No. 4:15-cv-3632 |
| Plaintiff, | § | |
| | § | JURY TRIAL DEMAND |
| v. | § | |
| | § | |
| GREGORY L. ARMSTRONG, HARRY N. PEFANIS, AL SWANSON, CHRIS HERBOLD, BERNARD FIGLOCK, EVERARDO GOYANES, GARY R. PETERSEN, JOHN T. RAYMOND, ROBERT V. SINNOTT, J. TAFT SYMONDS, CHRISTOPHER M. TEMPLE, PLAINS ALL AMERICAN GP LLC, PLAINS AAP, L.P., and PAA GP LLC, | § § § § § § § § § § § | |
| | § | |
| Defendants, | § | |
| | § | |
| and | § | |
| | § | |
| PLAINS ALL AMERICAN PIPELINE, L.P., | § § | |
| | § | |
| Nominal Defendant. | § | |

**VERIFIED UNITHOLDER DERIVATIVE COMPLAINT**

Plaintiff Alfred H. Davis ("Plaintiff"), by his undersigned attorneys, submits this Verified

Unitholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant

Plains All American Pipeline, L.P. ("Plains" or the "Company"), against certain directors and

officers of general partner entities that control the management, operations and affairs of Plains

(the "Individual Defendants"), as well as those general partner entities (the "Entity Defendants")

(collectively, "Defendants"). Plaintiff bases his allegations on, *inter alia*, actual knowledge as to

his own acts, Defendants' public statements and press releases, Plains' public filings with the United States Securities and Exchange Commission ("SEC"), wire and media reports published regarding the Company, securities analysts' reports and advisories about the Company, transcripts of Plains' investor conference calls, findings from regulatory actions and investigations, and on information and belief as to all other allegations after due investigation by its counsel.

## SUMMARY OF THE ALLEGATIONS

1.     This derivative lawsuit arises from the disastrous consequences of Defendants' strategy of focusing on maximizing the growth of the Company instead of ensuring that Plains complied with safety regulations.  Defendants' complete lack of diligence allowed the Company's internal safety infrastructure to deteriorate to the point that a catastrophic oil spill was inevitable.  In fact, the failure of Defendants to comply with their fiduciary duties led to the worst oil spill in California in the past quarter of a century, contaminating some of the most environmentally-sensitive and protected coastline in North America; exposing Plains to numerous lawsuits under the federal securities laws; and causing significant harm to Plains itself.

2.     Since Plains' initial public offering ("IPO") in 1998, Plains has grown into one of North America's largest energy pipeline operators.  Plains was able to achieve this tremendous growth through nearly two decades of substantial acquisition activity, during which the Company acquired several large pipelines and terminal systems – many of them aging and in need of significant repair – in Texas, California, and Canada, among other places.

3.     Taking control of such a vast network of pipelines, many in need of critical maintenance, placed considerable obligations on the Company.  In purchasing several companies with assets of varying quality, over a relatively short period of time, Defendants may not have

fully understood exactly what they were acquiring, which created unnecessary additional risk to Plains.

4.     Nevertheless, Defendants represented that Plains' "primary operational emphasis" was on pipeline integrity and maintenance, and that the Company had undertaken significant measures to prevent oil spills, ensure the integrity of its pipelines, and minimize the damage any oil spills might cause.  Although a Plains spokesman admitted that the previous owners of the pipelines didn't always maintain them diligently, he maintained that the company performed rigorous due diligence before each purchase and invested the necessary capital to make the pipelines safe.  The Company's history of large spills during its period of rapid expansion, however, suggests just the opposite.

5.     In addition to representing that its pipelines were "in substantial compliance" with federal regulations governing, among other things, the testing, operation, and management of pipelines, Defendants touted the Company as having an "integrity management program," which included measures that went above and beyond those legal requirements.  Moreover, Defendants consistently reassured investors that the Company devoted significant resources to complying with government-mandated pipeline integrity rules requiring the "establishment of pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences."

6.     These assurances aside, Defendants have a long history of ignoring crucial safety issues.  For instance, the Pipeline and Hazardous Materials Safety Administration (the "Pipeline Administration"), the federal agency that oversees the vast majority of Plains' pipelines, conducted multiple inspections on the Company's pipelines, many of which demonstrated severe worsening of pipeline integrity.

7.      Moreover, in 2010, the United State Environmental Protection Agency ("EPA") sued Plains for a series of approximately ten spills over several years in Texas, Louisiana, Oklahoma, and Kansas, which discharged 273,420 gallons of crude oil.  These spills included, among others, a 2004 crude oil release in West Texas during which 189,000 gallons of oil were discharged, at least partly into the nearby Pecos River, along with a 2005 spill in East Texas, which resulted in the release of approximately 50,000 gallons of oil that reached the Sabine River.  Just weeks after the EPA filed suit, Plains agreed to pay fines of $3.25 million and adhere to certain operational procedures and restrictions.

8.      Nevertheless, the Board has failed to regulate or reform the Company's troubled safety record in recent years.  Despite significant red flags alerting Defendants to problems with pipeline integrity, and repeated promises that Defendants were focused on the maintenance and reliability of Plains' pipelines as its "primary operational emphasis," Defendants continued to emphasize the acquisition of new assets over the monitoring and repair of existing assets.

9.      Notwithstanding repeated incidents calling attention to the possibility of a calamitous oil spill, Defendants elected not to remedy the significant pipeline integrity issues of which it was keenly aware, turning a blind eye to various safety violations and the threat they posed to the environment, commercial and private property, and the Company's financial well-being.

10.     Defendants have failed to adequately implement and monitor any effective safety initiatives on behalf of Plains.  These failures have forced the Company to incur millions of dollars in damages and significant additional damages resulting from the securities claims that have been asserted against the Company.

11.     Defendants' complete failure in this regard is remarkable.   According to the Pipeline Administration, Plains and its related companies have reported 229 safety and maintenance incidents on pipelines to federal regulators.   In fact, among the more than 1,700 operators included in a database maintained by the Pipeline Administration, only four reported more incidents than Plains.   The Company's reported infractions have involved pump failure, equipment malfunction, operator error, and pipeline corrosion, resulting in more than $23 million in property damage and the release of nearly 700,000 gallons of hazardous liquid.

12.     As a result of Defendants' failures, on May 19, 2015, Line 901 – a 10-mile-long, buried pipeline transporting heavy crude from Exxon Mobil's offshore platforms to oil refineries throughout southern California – ruptured and began spilling thousands of barrels of oil into an environmentally-sensitive coastal area in Santa Barbara, California (the "Santa Barbara Spill"). Approximately 3,400 barrels – or nearly 143,000 gallons – of crude oil were released from the 24-inch underground pipe.   At least one-fifth of the oil spilled into the Pacific Ocean, destroying beaches, threatening countless species of marine life, and killing hundreds of birds and over 100 mammals, including sea lions and dolphins.

13.     On May 21, 2015, the Pipeline and Hazardous Materials Safety Administration (the "Pipeline Administration"), the federal agency that oversees the vast majority of Plains' pipelines, issued a Corrective Action Order requiring Plains to take corrective actions with respect to Line 901 in order to protect the public, property and the environment from potential hazards arising from the spill.

14.     Among other things, the Corrective Action Order noted that previous inspections performed on Line 901 in June 2007 and July 2012 had demonstrated a worsening of pipeline integrity.   In 2007, there were 13 anomalies identified concerning Line 901.   Moreover, in 2012,

an inspection identified 41 such anomalies.  The May 21, 2015 Corrective Action Order required Plains to take immediate corrective actions, including shutting down and reviewing the line, testing the line, developing a remedial plan and performing a review of the Company's emergency response plan and training.

15.    On June 3, 2015, the Pipeline Administration issued an amended Corrective Action Order that revealed that there had been "extensive external corrosion" on Line 901 – and that the regulator had also identified "extensive corrosion" and other deficiencies in an adjoining pipeline, Line 903 – and required Plains to take additional corrective actions.  The Pipeline Administration noted that the results of Plains' own May 5, 2015 inspection survey revealed four areas on Line 901 with pipe anomalies that required "immediate investigation and remediation" under relevant regulations and Plains' own integrity management plan.  In addition, the examination and measurements of three of these areas by the Pipeline Administration indicated "extensive external corrosion."

16.    On November 12, 2015, the Pipeline Administration issued a second amended Corrective Action Order finding that Line 903 has similar corrosion characteristics as Line 901. Although Line 903 ceased operation on May 28, 2015, it remained filled with raw, unprocessed crude oil.  The Corrective Action Order found that Plains does not appear to have an effective corrosion control program and that Line 903 can be expected to have corroded further since the last inspection.  Plains was thereby required to empty and purge a key section of Line 903 and fill it with an inert gas to prevent further degradation of the pipeline and avoid any harm that may be caused from inadvertent release.  The Corrective Action Order further prohibited Plains from operating Line 903 until authorized to do so by the Pipeline Administration.

17.     Defendants were doubtlessly aware of Plains' repeated spills and legal and regulatory failings.  These failings concerned the core of Plains' business that Defendants were explicitly obligated to oversee.  Furthermore, Plains had been the subject of lawsuits by the U.S. federal government and Canadian authorities arising out of spills that took place in the last day.  Moreover, Plains' had entered into consent orders with the U.S. federal government and pled guilty to federal and provincial charges in Canada in connection therewith.  It is inconceivable that Defendants were unaware of Plains' endemic regulatory and compliance issues.

18.     Despite various spills and continuous regulatory issues, and under Defendants' direction, Plains repeatedly represented to investors that it was in substantial compliance with environmental regulations and that pipeline integrity and maintenance was Plains' "primary operational emphasis."  Plains further stated that the Company had undertaken significant measures to prevent oil spills, ensure the integrity of its pipelines, and to minimize the damage any such incidents may cause.  In fact, Plains specifically represented to regulators that Line 901 was closely monitored, that the pipeline and "its operation are state-of-the-art," and that a spill at this pipeline would therefore be "extremely unlikely."

19.     Plains has represented that it has "implemented programs intended to maintain the integrity of our assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention" and "devote[d] substantial resources to comply with [government]-mandated pipeline integrity rules," including "requirements for the establishment of pipeline integrity management programs and for protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences."  According to Plains, the Company had "developed and implemented certain pipeline integrity measures that go beyond [its] regulatory mandate."  These statements were clearly false, as evidenced by the May

2015 spill and subsequent events that showcased the corroding condition of Plains' pipelines and Plains' failure to bring its operations into compliance with regulatory requirements.

20.     These false and misleading representations were made during Plains Holdings' initial public offering and secondary offerings made by Plains Holdings and Plains MLP, and were either expressly stated in the offering materials or incorporated by reference into the offering materials.   As set forth herein, Plains, its directors and senior executives misled investors by falsely stating that Plains was in substantial compliance with legal and regulatory requirements and went above and beyond to ensure pipeline safety and integrity, and are liable for their false and misleading statements.

21.     The Santa Barbara Spill and the revelation of the Company's failure to take corrective actions to protect its pipelines and the environment has caused and will cause severe financial consequences to Plains, including tens of millions of dollars in potential liability for damage to property, commercial interests, and wildlife, as well as possible criminal liability for violations of the Clean Water Act.   Less than a month after the spill, Plains had already incurred more than $60 million in clean-up costs.   As of August 2015, Plains announced that revenue had fallen by 40.5% and, by October 27, 2015, Plains' stock price had dropped by approximately 40% since the close of the markets on the eve of the Santa Barbara Spill.

22.     Plaintiff brings this action against the Individual Defendants, who are directors and officers of the Entity Defendants, as well as the Entity Defendants, who disregarded their fiduciary duties of loyalty, care, oversight, and good faith with respect to the Company's core operations.   Plaintiff asserts these claims because Defendants, including the Board of Directors (as defined below), cannot and will not do so.

## PARTIES

### A.    Plaintiff

23.    Plaintiff Alfred H. Davis ("Plaintiff") is a current limited partner of Plains, has been a limited partner of Plains at all material times alleged in this Complaint, and will continue to be a limited partner of Plains through the conclusion of this litigation.  Plaintiff resides in California.

### B.    Nominal Defendant and Entity Defendants

24.    Nominal Defendant Plains is a publicly-traded Delaware master limited partnership ("MLP"), headquartered in Houston, Texas, which is involved in interstate and intrastate crude oil pipeline transportation and crude oil storage activities.  The Company has grown into one of North America's largest energy pipeline operators by acquiring significant pipelines and terminal systems – many of them aging and in need of significant repair – in California, Texas, and Canada, among other places.  Plains Common Units are traded on the New York Stock Exchange ("NYSE") under the symbol "PAA."

25.    As with many publicly-traded master limited partnerships, Plains does not directly have officers, directors, or employees.  Plains is owned 98% by its limited partners and 2% by its general partner.  Its 2% general partner interest is held by Defendant PAA GP LLC ("PAA GP"), a Delaware limited liability company headquartered in Texas, whose sole member is Defendant Plains AAP, L.P., a Delaware limited partnership headquartered in Texas ("AAP").  AAP also owns all of the Company's incentive distribution rights ("IDRs").  Plains GP Holdings, L.P. ("PAGP"), a Delaware limited partnership that completed its initial public offering in October 2013, owns a 34.1% limited partner interest in AAP.  Defendant Plains All American GP LLC ("Plains GP"), a Delaware limited liability company headquartered in Texas, is AAP's general

partner.  PAGP is the sole member of Plains GP, and PAA GP Holdings LLC is the general partner of PAGP.

26.     The Company's operations are conducted directly and indirectly through, and its operating assets are owned by, its foregoing general partner affiliates and subsidiaries.  Plains GP has responsibility for conducting the Company's business and managing its operations; however, PAGP also controls its business and affairs through the exercise of its rights as the sole and managing member of Plains GP, including its right to appoint certain members to the board of directors of Plains GP.  None of the general partner entities receive a management fee or other compensation in connection with the management of the Company's business, but they are reimbursed for substantially all direct and indirect expenses incurred on its behalf.

27.     Plains GP Holdings, L.P. owns the largest beneficial interest in AAP.  After that, the next three largest beneficial owners are EMG Investment, LLC (Board member Raymond's company), KAFU Holdings & KA First Reserve (affiliates of Kayne Anderson, where Board member Sinnott is employed), and Oxy Holding Company (the parent company of Occidental Holdings, where Board member Figlock is employed).

### C.    Officer Defendants

28.     Defendant Gregory L. Armstrong ("Armstrong") is, and was at all relevant times, Chairman of the Board of Directors and Chief Executive Officer ("CEO") of Plains GP.  He has served as Chairman and CEO since the Company's formation in 1998.  In exchange for his purported trust, loyalty, and fidelity to Plains, Armstrong received a salary, performance bonus, non-cash benefits, and other remuneration in the amounts of $7,454,118 in 2013 and $4,292,040 in 2014.  Defendant Armstrong was provided with copies of the Company's public filings, press releases and other communications alleged herein to be misleading prior to or shortly after their

issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Defendant Armstrong resides in Texas.

29.     Defendant Harry N. Pefanis ("Pefanis") is, and was at all relevant times, President and Chief Operating Officer ("COO") of Plains GP.  He has served as President and COO since the Company's formation in 1998.  In exchange for his purported trust, loyalty, and fidelity to Plains, Pefanis received a salary, performance bonus, non-cash benefits, and other remuneration in the amounts of $6,962,880 in 2013 and $4,117,040 in 2014.  Defendant Pefanis resides in Arizona.

30.     Defendant Al Swanson ("Swanson") is, and was at all relevant times, Executive Vice President and Chief Financial Officer ("CFO") of Plains GP.  He has served as Executive Vice President and CFO since February 2011.  He previously held various other roles at the Company, after joining Plains in or about 2000.  In exchange for his purported trust, loyalty, and fidelity to Plains, Swanson received a salary, performance bonus, non-cash benefits, and other remuneration in the amounts of $3,841,659 in 2013 and $1,917,040 in 2014.   Defendant Swanson resides in Texas.

31.     Defendant Chris Herbold ("Herbold") is, and was at all relevant times, Vice President – Accounting and Chief Accounting Officer of Plains GP.  He has served in this capacity since August 2010 and worked in various other capacities since joining Plains in April 2002.  Defendant Herbold resides in Texas.

32.     Defendants set forth in paragraphs 28 to 31 above are referred to herein as the "Officer Defendants."

### D.    Board of Directors

33.     As provided in the Sixth Amended and Restated Limited Liability Company Agreement of Plains GP  (the "GP Agreement"), the board of directors consists of eight members, appointed as follows: Three of the members are the same individuals designated to serve on the board of directors of GP Holdings by the three members of GP Holdings that currently hold board designation rights for the GP Holdings board of directors (affiliates of The Energy & Minerals Group, Kayne Anderson Investment Management Inc. and Occidental Petroleum Corporation); Four of the members (three of whom must be independent directors eligible to serve on the audit committee) are elected, and may be removed, by PAGP, acting by majority vote through the board of directors of its general partner, GP Holdings; and one of the members is the Chief Executive Officer of GP LLC.  As a result of this structure, at least four of the eight members of the board of directors are not independent directors; moreover, there is no lead independent director.

34.     Defendant Bernard Figlock ("Figlock") is, and was at all relevant times, a director of Plains GP.  He has served as a director of Plains GP since January 2015.  Mr. Figlock is also the Vice President and Treasurer of Occidental Petroleum Corporation ("Occidental"), where he directs and oversees management of treasury and risk management functions.  Additionally, Mr. Figlock is a director of PAA GP Holdings LLC, which is the general partner of Plains GP Holdings, L.P.  Occidental is one of the largest U.S. oil and gas companies, based on equity market capitalization.  In November 2014, Plains acquired a 50% interest in BridgeTex Pipeline Company, LLC ("BridgeTex") from Occidental for $1.088 billion.  Occidental is the primary shipper on the BridgeTex pipeline.  Moreover, during 2014, Plains recognized sales and transportation and storage revenues of approximately $1.2 billion from companies affiliated with

Occidental and purchased approximately $0.9 billion of petroleum products from companies affiliated with Occidental.  Defendant Figlock resides in Texas.

35.     Defendant Everardo Goyanes ("Goyanes") is, and was at all relevant times, a director of Plains GP.  He has served as a director of Plains GP since May 1999 and currently serves as Chair of the Board's Audit Committee.  Mr. Goyanes has worked with various oil and natural resources companies throughout his career.  Mr. Goyanes is one of three purportedly independent directors elected to the Board by Plains GP Holdings, L.P., and may be removed from the Board by Plains GP Holdings, L.P., acting by majority vote through the board of PAA GP Holdings LLC.  Defendant Goyanes resides in Texas.

36.     Defendant Gary R. Petersen ("Petersen") is, and was at all relevant times, a director of Plains GP.  He has served as a director of Plains GP since June 2001 and currently serves as a member of the Board's Compensation and Governance Committees.  Mr. Petersen was elected to the Board by Plains GP Holdings, L.P., and may be removed from the Board by Plains GP Holdings, L.P., acting by majority vote through the board of PAA GP Holdings LLC. Defendant Petersen resides in Texas.

37.     Defendant John T. Raymond ("Raymond") is, and was at all relevant times, a director of Plains GP.  He has served as a director of Plains GP since December 2010 and currently serves as a member of the Board's Compensation Committee.  Mr. Raymond is also the CEO & Managing Partner of EMG Investment, LLC.  EMG is a private investment firm with approximately $16.8 billion of regulatory assets under management.  EMG targets equity investments of $150 million to $1,000 million in the energy and minerals sectors. Approximately $8.1 billion in commitments have been allocated across the energy sector since inception.  EMG owns approximately 20% of AAP.  Additionally, Mr. Raymond is a director of

PAA GP Holdings LLC, which is the general partner of Plains GP Holdings, L.P.  Defendant Raymond resides in Texas.

38.     Robert V. Sinnott ("Sinnott") is, and was at all relevant times, a director of Plains GP.  He has served as a director of Plains GP since September 1998 and currently serves as Chair of the Board's Compensation Committee.  Mr. Sinnott previously held positions with United Energy Resources, another pipeline company, and with Bank of America, in its oil and gas finance department.  He is the President & CEO of Kayne Anderson Capital Advisors, L.P. ("Kayne Anderson"), a leading alternative investment firm that manages investments across multiple asset classes including energy, real estate, credit, and specialty growth capital.  During 2014, Plains purchased approximately $6.2 million of oil from companies owned and controlled by funds managed by Kayne Anderson.  Additionally, Mr. Sinnott is a director of PAA GP Holdings LLC, which is the general partner of Plains GP Holdings, L.P.

39.     Defendant J. Taft Symonds ("Symonds") is, and was at all relevant times, a director of Plains GP.  He has served as a director of Plains GP since June 2001 and currently serves as a member of the Board's Audit Committee and Chair of the Governance Committee.  Mr. Symonds is one of three purportedly independent directors elected to the Board by Plains GP Holdings, L.P., and may be removed from the Board by Plains GP Holdings, L.P., acting by majority vote through the board of PAA GP Holdings LLC.  Defendant Symonds resides in Texas.

40.     Defendant Christopher M. Temple ("Temple") is, and was at all relevant times, a director of Plains GP.  He has served as a director of Plains GP since May 2009 and currently serves as a member of the Board's Audit Committee.  Mr. Temple is also the chairman of Brawler Industries, LLC, a distributer of engineered plastics used in the exploration and

production of oil and gas.  Additionally, Mr. Temple has served as a licensed CPA for clients in the energy sector.  Mr. Temple is one of three purportedly independent directors elected to the Board by Plains GP Holdings, L.P., and may be removed from the Board by Plains GP Holdings, L.P., acting by majority vote through the board of PAA GP Holdings LLC.  Defendant Temple resides in Texas.

41.     According to the Form 10-K filed by Plains with the SEC for the fiscal year ended December 31, 2014 (the "2014 10-K"), the Board retains responsibility for the oversight of Plains' management with regard to "identifying, managing and monitoring events that present opportunities and risks with respect to creation of value for [its] unitholders."

42.     Armstrong, Goyanes, Symonds, Raymond, Sinnott, Temple, Petersen, and Figlock are referred to herein as the "Directors" or the "Board".  Armstrong, Goyanes, Symonds, Raymond, Temple, Petersen, and Figlock are referred to herein as the "Director Defendants." Defendants Goyanes, Symonds, and Temple constitute the Plains GP audit committee (the "Plains Audit Committee").  Collectively, the Officer Defendants and the Director Defendants are referred to herein as the "Individual Defendants."

43.     Defendants have fiduciary duties to the Company.  These include the common-law obligations of trust, loyalty, good faith, oversight, and due care.  Defendants were and are required to use their utmost ability to control and manage Plains in a fair, just, honest, and equitable manner.  Defendants were entrusted to use their abilities faithfully to ensure the Company's best interests in the long term.  Although the Plains limited partnership agreement purports to limit certain of the general partner's fiduciary duties, those purported limitations do not insulate Defendants from the wrongful conduct set forth herein.

44.     To discharge their duties, Defendants were required to, *inter alia*, exercise reasonable and prudent supervision over the selection, oversight, performance, and performance monitoring of management and employees, as well as policies, standards, practices and controls of the Company, including those controls designed to ensure that the Company's operations were conducted in a safe manner; the Company's safety controls are especially crucial to a business such as Plains, which constantly engages in the transport of hazardous materials through environmentally-sensitive areas.   Further, Defendants were responsible for maintaining and establishing adequate internal controls to ensure that the Company's public statements were based on accurate research, financial and operational information, and were not presented in a misleading manner.

## JURISDICTION AND VENUE

45.     This Court has jurisdiction over the subject matter of this Action pursuant to 28 U.S.C. § 1332(a) because derivative Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.  This Action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.

46.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(a) and 1391(b) because nominal defendant Plains is headquartered in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## FURTHER FACTUAL ALLEGATIONS

### Plains' Abysmal Safety Record

47.     The majority of Plains' pipelines are subject to the jurisdiction of the Pipeline Administration, which enforces regulations promulgated under the Hazardous Liquids Pipeline Safety Act of 1979 (the "Pipeline Safety Act").   The Pipeline Safety Act includes rules

governing the design, installation, testing, construction, operation, replacement, and management of pipeline and tank facilities, as well as regulations that require pipeline operators to adopt measures to reduce the environmental impact of oil spills, including the maintenance of spill response plans and training.  In addition, the Pipeline Administration requires pipeline operators like Plains to implement enhanced pipeline integrity management programs that include frequent inspections to identify and correct pipeline anomalies, as well as other measures to ensure pipeline integrity in "high consequence areas," such as high population areas, commercial waterways, and areas that are particularly sensitive to environmental damage.

48.     Nevertheless, over the past decade, Plains and its affiliated companies have reported to federal regulators 229 safety and maintenance incidents on its pipelines.  In fact, only four of the more than 1,700 pipeline operators included in a database maintained by the Pipeline Administration reported more incidents than Plains.   The Company's reported infractions involved pump failure, equipment malfunction, operator error, and pipeline corrosion, resulting in tens of millions of dollars in property damage and the release of more than 688,000 gallons of hazardous liquid.  Plains has also been required to pay millions of dollars in fines and tens of millions of dollars to upgrade more than 10,000 miles of pipe.

49.     According to the EPA, between June 2004 and September 2007, approximately 6,510 barrels (more than a quarter of a million gallons) of crude oil were discharged from various pipelines owned and operated by Plains into navigable waters and/or adjoining shorelines in the states of Texas, Louisiana, Oklahoma, and Kansas in violation of the Clean Water Act.  In particular, the EPA noted the following discharges:

a. In June 2004, a damaged poly-pipeline slip insert and external corrosion caused nearly 6,000 gallons of crude oil to spill into the East Spring Creek and adjacent wetlands in Kansas;

b. In November 2004, external corrosion led to the spill of over 1,500 gallons of crude oil into the Latan Creek in Texas;

c. In December 2004, only months after the size of the Company was nearly doubled by the purchase of another large pipeline operator, a cracked weld joint on a Plains pipeline in Texas caused a discharge of more than 140,000 gallons of oil, sending several thousand gallons into the Pecos River;

d. In January 2005, a failed pressure relief pin coupled with an undersized temporary relief tank located outside of secondary containment led to the spill of over 37,000 gallons of crude oil, sending discharges into the Sabine River in Texas;

e. In March 2005, external corrosion on a Plains pipeline in Texas brought about a discharge of oil into Caddo Lake;

f. In April 2005, internal corrosion of a Louisiana section of Plains pipeline caused nearly 200 gallons of crude oil to spill into Big Lake and adjacent wetlands;

g. In July 2005, internal corrosion led to a spill of over 1,500 gallons of crude oil into tributaries of Pond Creek;

h. In November 2005, external pipeline corrosion caused a spill of more than 600 gallons of crude oil in Texas, leading to discharges into Bull Creek Canal;

       i.    In August 2007, external pipeline corrosion caused a spill of nearly 13,000 gallons of oil, discharging crude oil into Texas' Colorado River; and

       j.    In September 2007, external corrosion of a Plains pipeline in Texas, in a repeat of the August 2007 incident, caused another 3,150 gallons of crude oil to leak from the pipeline, discharging more crude oil into the Colorado River.

50.    In 2010, as a result of these spills, the EPA filed a complaint against Plains, concurrently with the entry of a consent decree (the "2010 Consent Decree"), alleging that the Company was liable for civil penalties and injunctive relief to the United States pursuant to the Clean Water Act.  Under the 2010 Consent Decree, Plains was required to pay $3.25 million in civil penalties and spend $41 million to upgrade more than 10,000 miles of pipe.  Additionally, the EPA required Plains to conduct weekly aerial patrols of certain of its pipelines to check for leaks, install computational pipeline monitoring capabilities to ensure ongoing monitoring for 110 segments of pipeline (including Line 901), and spend millions of dollars on efforts to mitigate threats posed by corrosion.  The 2010 Consent Decree additionally imposed various reporting requirements on the Company including, among other things, updates on the status of required compliance measures, summaries of action plans developed pursuant to the Consent Order, descriptions of steps taken to implement the action plans, and descriptions of problems encountered or anticipated to be encountered in the implementation of the Consent Order, along with implemented or proposed solutions.  The Consent Decree further provided that Plains would be liable for monetary penalties to the United States for violations of the Consent Decree.

51.    On April 29, 2011, a 30-year-old weld on a pipeline in Canada failed, resulting in the discharge of approximately one million gallons of crude oil into marshlands near the community of Little Buffalo, Alberta (the "Little Buffalo Spill").  A persistent odor from the oil

forced a nearby school to close for several days.  The pipeline, which had been laid in 1966, was purchased by Plains in 2008.  Investigators found that, before the spill, the company's leak detection gauges produced readings 20 times the level that would indicate a problem, but, according to court records, the Company had few written policies regarding to leak detection, so the problems were not properly reported and the pipeline was not shut down.

52.     In June 2012, heavy rains caused a 46-year-old pipeline to leak and spill thousands of barrels of crude oil into the Red Deer River in Alberta, Canada (the "Red Deer River Spill").  The spill forced a recreational reservoir downstream from the spill to close for weeks, and many residents were treated at a local hospital for respiratory complaints.  The Alberta Energy Regulator, which oversees the oil industry in the province of Alberta, found that Plains had failed to complete inspections of the pipeline at the frequency required by its own maintenance standards, and that the Company did not inspect the pipeline annually, as required by the federal pipeline rules.  Moreover, Plains neglected to take precautionary measures to prevent flood damage, despite warnings from provincial authorities.

53.     In May 2014, a valve malfunction caused another Plains pipe to rupture in the Atwater Village neighborhood of Los Angeles, California, causing oil to erupt more than 20 feet into the air and rain down on a nearby strip club and other local businesses (the "Atwater Village Spill").  Patrons of the strip club were coated in oil and the club was forced to evacuate.  According to a report from the California State Fire Marshal, the mess took several days to clean up and caused more than $3 million in damage to nearby businesses and roads.  Investigators determined that a set of screws holding a valve in place failed, leading to the release of nearly 14,000 gallons of crude oil into the environment.

54.     In the wake of these and other prior violations, Defendants made a concerted effort to inform the investing public that it had adopted enhanced measures to ensure the integrity of its pipelines and that the frequency of spills had thus reduced dramatically.   For instance, in the Company's Form 10-K filed with the SEC on February 27, 2013 (the "2012 10-K"), Plains highlighted the measures the Company had allegedly taken in response to the 2010 Consent Decree.   The 2012 10-K reassured investors that "pipeline integrity management" was the Company's "primary operational focus," and that Plains had "implemented programs intended to maintain the integrity of [its] assets, with a focus on risk reduction through testing, enhanced corrosion control, leak detection, and damage prevention."

55.     These assurances notwithstanding, federal regulators have been documenting violations by Plains for years, noting the Company's substandard records on emergency training and how it would protect pristine coastline in the event of a spill.   The Pipeline Administration, for instance, noted that Plains failed to properly document pressure tests on tanks and failed to keep adequate records on how it would prevents spills in sensitive environmental areas, or respond if such a spill did occur.   While not all of the violations noted by the Pipeline Administration resulted in fines against Plains, a spokeswoman for the agency stated that "all safety related issues matter because they reflect the overall safety culture of an organization."   Plains' abysmal safety record, therefore, reflects the insubstantial focus on safety promoted by Defendants.

56.     Nevertheless, Plains has consistently touted that it supports its "commitment to safe and environmentally-responsible operations through extensive and ongoing training, as well as investment in any necessary equipment, systems, processes or other resources."   As part of this alleged commitment, Plains' website stresses that the Company "diligently strives to comply

with applicable environmental, health and safety rules, laws and regulations."   The record demonstrates that these assertions are no more than meaningless tautologies.  Defendants have led the Company on a fast and furious expansion of its operations throughout North America, without regard to the way that these acquisitions have overburdened the Company.

**Defendants Ignored Red Flags Prior to the Santa Barbara Spill**

57.     Defendants' reckless inattention to safety and maintenance issues reached its climax in Santa Barbara.

58.     In addition to the numerous spills detailed herein, inspections performed on Line 901 in June 2007 and July 2012 had demonstrated a worsening of pipeline integrity.  In 2007, there were 13 anomalies identified that related to corrosion of Line 901, and the 2012 inspection identified 41 such anomalies.

59.     Furthermore, the Pipeline Administration noted that the results of Plains' own May 5, 2015 inspection survey revealed four areas on Line 901 with pipe anomalies that required "immediate investigation and remediation" under relevant regulations and Plains' own integrity management plan.  In addition, the examination and measurements of three of these areas by the Pipeline Administration indicated "extensive external corrosion."

60.     In fact, the Corrective Action Order issued by the Pipeline Administration on June 3, 2015 (the "Corrective Action Order"), reported that experts estimated that the pipeline wall thickness at the release site had degraded to one-sixteenth of an inch, a reduction of over 80% of its original thickness.  The Corrective Action Order further noted that inspection surveys conducted in 2013 and 2014 for different segments of Line 903 – a Plains pipeline adjoining Line 901 – appeared inconsistent.   According to the Pipeline Administration, these

inconsistencies were a clear red flag that should have prompted immediate investigation by the Company.

61.     According to data compiled by the Pipeline Administration, from 2006 until the time of the Santa Barbara Spill, more than 20 federal enforcement actions had been initiated against Plains, mostly involving corrosion control and maintenance problems.

62.     If it were not for Defendants' lack of oversight, the Santa Barbara Spill likely could have been prevented.  Richard B. Kuprewicz, president of pipeline consulting firm Accufacts Inc., stresses that maintaining pipelines is not complicated.  In fact, he told *The L.A. Times*, "In 40 years of investigating pipeline incidents, I haven't seen one that wasn't preventable.  There are no such thing as accidents."

## Defendants' Inadequate Response to the Santa Barbara Spill

63.     Defendants' initial response to the Santa Barbara spill was entirely inadequate and only served to intensify the damage to the environmentally-sensitive coastline.

64.     State law required the Company to report the spill to the federal National Response Center within 30 minutes of detection, and Plains' internal policies required such notification "at the earliest practicable moment," boasting that it should take no more than 15 minutes to discover a release and shut down the flow.

65.     Nevertheless, Plains did not report the spill to the National Response Center for several hours after it had been discovered.  In fact, the National Response Center was notified of the spill by the Santa Barbara County Fire Department, nearly two-and-a-half hours before Plains formally informed the agency, after a 911 call was placed to the fire department.

66.     In the days immediately following the rupture of Line 901, Defendants attempted to downplay and conceal the severity of the oil spill.  Plains officials reported that their own

analysis of a "worst case" scenario for the spill, which was based on the typical flow rate of oil and the elevation of the pipeline, showed that as many as 105,000 gallons in total could have been released from Line 901, with only 21,100 gallons of crude oil – at most – flowing into the Pacific Ocean.

67.     Subsequently, on May 26, 2015, Plains filed a Form 8-K with the SEC, which described the spill and estimated that "the amount of released crude oil could be as high as approximately 2,400 barrels" or 101,000 gallons – a figure reflecting a 4,000-gallon reduction from the initial estimates that Defendants had provided to the media.

68.     It was not until August 2015, in an appendix to a presentation released along with the Company's second-quarter financial report, that Plains admitted that the leak could have been more severe than initially estimated.  Plains revised its estimate of the damage upwards by approximately 41%, stating that roughly 3,400 barrels – 143,000 gallons – of crude oil may have been discharged during the Santa Barbara Spill.

69.     Moreover, particularly due to Plains' lackluster response, the oil was able to spread out in waves over approximately nine miles of the scenic Santa Barbara coast.  Even when the beaches begin to look clean again, experts know that there is oil that has sunk into the sediments, which will be stirred up again and come back to shore when a large storm hits.  To the extent this occurs, Santa Barbara officials will ensure that Plains is held responsible for further damage.

**The Severe Consequences to Plains**

70.     As of June 2015, less than a month after Line 901 ruptured, a Plains official estimated that the costs of cleaning up the Santa Barbara Spill had already reached $62 million.

By August 2015, the Company had spent approximately $100 million cleaning up the Santa Barbara Spill.

71.     Plains incurred costs of approximately $3 million a day to stop the oil leak and remediate the effects of the Santa Barbara Spill, and officers of Plains estimated that the total cost of addressing the spill could be as high as $257 million.

72.     In addition to these financial costs, in the wake of the Santa Barbara Spill, the California Attorney General's Office announced that it was conducting a criminal and civil investigation of the spill, in conjunction with the Santa Barbara District Attorney.

73.     On February 27, 2015, Plains filed a prospectus in connection with a secondary offering of 21,000,000 Plains Common Units, that was made effective pursuant to a Registration Statement filed on Form S-3 with the SEC on September 27, 2012 (the "February 2015 Offering Materials").  The February 2015 Offering Materials incorporated by reference the Company's 2014 Annual Report filed with the SEC on Form 10-K on February 25, 2015, and made numerous representations concerning the Company's safety efforts and regulatory compliance, including that Plains fully complied with federal regulations governing its business, including rules governing the monitoring and maintenance of its pipelines and the safety and integrity of those pipelines.

74.     Specifically, the Company reported that it spent $107 million in 2014 in connection with costs associated with the "inspection, testing and correction of identified anomalies" required by federal law and the 2002 and 2006 amendments to the HLSPA that "require transportation pipeline operators to implement integrity management programs, including more frequent inspections, correction of identified anomalies and other measures to ensure pipeline safety in 'high consequence areas,' such as high population areas, areas

unusually sensitive to environmental damage, and commercially navigable waterways." The Company stated that "we believe our pipelines are in substantial compliance with" these requirements.

75.     Further, the Company represented that "[i]n addition to required activities, our integrity management program includes several voluntary, multi-year initiatives designed to prevent incidents," reporting that costs incurred for such activities were approximately $21 million in 2014. The Company further represented that it maintained state-of-the-art oil spill response procedures that ensured that, if such an incident were to occur, the Company would be able to effectively and efficiently limit any potential damage.

76.     The Company also reported that it went above and beyond the requirements of these federal regulation by maintaining "an internal review process" to "examine[] various aspects of its pipeline and gathering systems that are not subject to the DOT pipeline integrity management mandate" and to "review the surrounding environment, condition and operating history of these pipeline and gathering assets to determine if such assets warrant additional investment or replacement."

77.     According to the Company, pursuant to this "internal review process," it can and frequently does determine "as a result of our own internal initiatives" "to spend substantial sums to ensure the integrity of and upgrade our pipeline systems and, in some cases … take pipelines out of service if we believe the cost of upgrades will exceed the value of the pipelines."

78.     The Company further represented that it "devote[d] substantial resources to comply with [Department of Transportation]-mandated pipeline integrity rules," including rules under the HLPSA which included certain pipelines that were not previously subject to regulation. Under those regulations, the Company was required to establish "pipeline integrity management

programs" and programs for "protection of 'high consequence areas' where a pipeline leak or rupture could produce significant adverse consequences."  According to the Company, it had "developed and implemented certain pipeline integrity measures that go beyond [the] regulatory mandate."  In addition to the measures the Company represented it undertook to comply with federal law, Plains also represented that its businesses' "primary operational" focus was on pipeline integrity maintenance and monitoring.

79.    Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k ("Section 11" of the "Securities Act"), was enacted to ensure that issuers of securities provide purchasers with full and accurate material information.  Under the Securities Act, in connection with an offering, the issuer must file a registration statement, and a prospectus, that contains all material information about the security and the company.

80.    Under Section 11, the issuing company, the company's directors, and others (including every person who signed the registration statement, and underwriters of the offering) are strictly liable for materially false and/or misleading statements and/or omissions in the offering documents.

81.    As described herein, the offering materials in connection with the October 2013 and February 2015 Plains offering contained untrue statements of material fact, and omitted other facts necessary to make the statements therein not misleading, and failed to disclose material facts.

82.    The offering materials contained statements concerning the Company's compliance with rules and regulations governing its pipeline maintenance, monitoring, and spill response procedures.  Those statements were false and misleading because, as would later be revealed, the Company's pipelines, and its monitoring and maintenance of those pipelines, was

woefully inadequate and violated federal law.  Specifically, as the Pipeline Administrator's preliminary findings in the June 3, 2015 Corrective Action Order make clear, Plains lacked adequate leak monitoring systems (as required by API 1130 and the 2010 Consent Order), and failed to take appropriate remedial measures in response to the pipeline integrity defects that had been previously identified in Line 901 (as required by the 2002 and 2006 amendments to the HLPSA).  Further, as demonstrated by Plains' hours-long delay in notifying relevant regulatory officials of the Line 901 spill once it was identified, the Company was wholly unprepared to respond to a leak as required by the Company's own response plan and provisions of the Clean Water Act.  Moreover, rather than maintain an internal review program designed to ensure that deficient pipelines were promptly repaired or replaced, the Company in fact deliberately ignored serious and dangerous pipeline conditions, as evidenced by findings in the June 3, 2015 Corrective Action Order (and amendments thereto) regarding Lines 901 and 903, and the fact that, as the *Los Angeles Times* disclosed in a May 20, 2015 articles, Plains in fact had an incident rate per mile of pipe that was three times the national average.

83.     Moreover, each of the Director Defendants controlled and was responsible for the materially false and misleading offering materials.  Plains is strictly liable under Section 11 for those materially false and misleading offering materials that were issued under the Director Defendants' direction.

84.     These false and misleading statements have given rise to numerous class actions filed against, among others, the Company and the Directors in this District, alleging, *inter alia*, that such statements were false and misleading, giving rise to claims under Section 11.

## DERIVATIVE ALLEGATIONS

85.     Plaintiff brings this action derivatively in the right and for the benefit of Plains to redress injuries suffered, and to be suffered, by Plains as a result of Defendants' breaches of fiduciary duties by virtue of the wrongs alleged herein and the misconduct of the other defendants.   The claims herein arise from an actual or proposed act or omission involving negligence, default, breach of duty, and/or breach of trust by the directors of Plains, as well as the misconduct of other Defendants.   Plains is named as a nominal defendant solely in a derivative capacity.   Plaintiff seeks to assert solely causes of action vested in Plains and seek relief solely on behalf of Plains.

86.     Plaintiff will adequately and fairly represent the interests of Plains in enforcing and prosecuting its rights.

87.     Plaintiff has been an owner of Plains units at all relevant times and continues to own such securities at this time.

88.     Prosecution of this action, independent of the Plains Board of Directors, is in the best interests of the Company.

89.     This action is not being used by Plaintiff to gain any personal advantage, nor does Plaintiff maintain any personal agenda other than seeking to correct the wrongs that have been done to the Company.   Plaintiff has not received, been promised, or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this action, except for such fees or other payments, including attorneys' fees, as the Court expressly approves to be paid to Plaintiff or on Plaintiff's behalf.

90.     To this end, Plaintiff has taken steps to commence this action and has retained counsel experienced in derivative litigation and corporate governance litigation.   To the extent

Court permission is required to continue this action, such permission is hereby sought, and this Complaint constitutes Plaintiff's *prima facie* case for obtaining such permission.

91.    The claims herein concern acts and omissions that were not authorized by Plains but, rather, occurred as a consequence of the unauthorized and unratified failure of Defendants to execute their fiduciary duties to the Company.

92.    Plaintiff has not made a demand on the Board of Directors to assert the claims set forth herein, as such a demand would be futile.  As of the date hereof, Plains has not made a decision whether to pursue the claims herein, nor would any decision not to pursue the claims be entitled to deference.  Plains cannot act except through its Board of Directors, and the Board could not and would not objectively determine whether bringing these claims was in the best interests of the Company and its unitholders.

93.    **First**, the acts and decisions of the Plains Board – as catalogued herein – constituted a breach of the Directors' duties of care, oversight, good faith, candor, and loyalty. These decisions were not, and could not have been, the product of the Board's good faith, informed business judgment.  As such, and for this separate and independent ground alone, demand on the Board to bring these claims on the Company's behalf would be a futile gesture.

94.    **Second**, the Directors have conclusively demonstrated their inability or unwillingness to pay due care to safety and maintenance issues at Plains despite several prior regulatory actions seeking to hold them to account for their failures in that regard.  The Directors' actions – or lack thereof – constituted more than simply unrelenting inattention, but rather constituted willful blindness to countless red flags signaling significant problems with Plains' safety procedures and reporting structure.

95.     **Third**, the Directors face a substantial threat of liability for their breaches of fiduciary duty set forth herein.  Indeed, the Board members were specifically tasked with control and oversight over the conduct that had such grave consequences at Plains.

96.     **Fourth**, as described above, Defendant Armstrong, the executive or "inside" director of Plains is unable to objectively determine whether to bring these claims in all events. Defendant Armstrong is incapable of impartially considering a demand because it would be against his own pecuniary interest to pursue this litigation.  Defendant Armstrong has received over $40 million in compensation from Plains since 2012.  Currently, Defendant Armstrong holds an interest in over 10 million Plains units that have not yet vested, with a total value of nearly $250 million.  Accordingly, Defendant Armstrong's significant financial ties to the Company render him unable to consider a demand.  Moreover, Defendants Armstrong, Figlock, Raymond, and Sinnott also serve on the board of PAA GP Holdings LLC, and thus depend on the ability of both Plains GP *and* PAA GP Holdings LLC to make significant payments for their services.  These Defendants would not want to risk this dual compensation by bringing the claims at issue here.

97.     In addition, as the Company admits in its public filings, Directors Figlock, Raymond and Sinnott are not independent directors by virtue of their own companies' interlocking business relationships with Plains.

98.     As described above, Defendant Figlock is the Vice President and Treasurer of Occidental.  Plains has an extensive financial relationship with Occidental.  In 2014, Plains MLP acquired a 50% interest in BridgeTex from Occidental for $1.088 billion.  Furthermore, in 2014, Plains recognized sales and transportation and storage revenues of approximately $1.2 billion from companies affiliated with Occidental and Plains purchased approximately $0.9 billion of

petroleum products from companies affiliated with Occidental.  In 2013, Plains recognized sales and transportation and storage revenues of approximately $1.3 billion from companies affiliated with Occidental and Plains purchased approximately $0.9 billion of petroleum products from companies affiliated with Occidental.   Similarly, in 2012, Plains recognized sales and transportation and storage revenues of approximately $1.6 billion from companies affiliated with Occidental and Plains purchased approximately $0.6 billion of petroleum products from companies affiliated with Occidental.  Defendant Figlock would not endanger Occidental's significant financial relationship by pursuing this litigation.

99.     Defendant Raymond is also incapable of impartially considering a demand because of his vast financial ties to Plains.  Defendant Raymond has been an owner of Plains' general partner since 2001 and served on the Board of Plains' general partner from 2001 to 2005.  Furthermore, Defendant Raymond is the founder and majority owner of The Energy & Materials Group, one of Plains MLP's largest unitholders.  EMG Investment LLC ("EMG") holds an interest in the general partner of NGL Energy Partners ("NGL"), which acquired High Sierra Energy LP ("High Sierra") and its general partner, a company in which EMG previously had a 25% general partner interest, in 2012.  Defendant Raymond currently serves on the Board of NGL.  In 2012, Plains purchased $10.7 million of petroleum products from High Sierra and recognized crude oil sales and transportation revenues of $0.6 million from High Sierra.

100.    As described above, Sinnott is President, CEO, and Chief Investment Officer of Kayne Anderson.  Plains conducts significant dealings with Kayne Anderson.  For example, in 2014, Plains purchased approximately $6.2 million of oil from companies owned and controlled by funds managed by Kayne Anderson .  In 2013, Plains purchased approximately $3.9 million of oil from companies owned and controlled by funds managed by Kayne Anderson, and in

2012, Plains MLP purchased approximately $5.6 million of oil from companies owned and controlled by funds managed by Kayne Anderson.  Sinnott would not endanger Kayne Anderson's significant financial relationship by pursuing this litigation.

101.    **Fifth**, Plains' purportedly independent directors, Defendants Goyanes, Symonds and Temple, are members of its Audit Committee.  The Audit Committee Charter provides that the Audit Committee Members are responsible for monitoring "the compliance by the Partnership with legal and regulatory requirements."  The Audit Committee Charter requires the committee to "meet on at least a quarterly basis."  Furthermore, pursuant to the Audit Committee Charter, the committee must "make regular reports to the Board."  In connection with any recommendation to the Board, the Audit Committee Members are to "provide such background and supporting information as may be necessary for the Board to make an informed decision."

102.    The Audit Committee Members have wide-ranging compliance oversight responsibilities according to the Audit Committee Charters.  For example, the Audit Committee Members must: Obtain reports from management, the Vice President of internal audit and the independent auditor with respect to compliance by the Company and its subsidiary/foreign affiliated entities with applicable legal requirements, review reports and disclosure and affiliated party transactions, and advise the Board with respect to policies and procedures regarding compliance by the Company with applicable laws and regulations.

103.    Moreover, the Audit Committee Members are required to "discuss with the General Counsel legal matters that may (a) have a material impact on the Partnership's financial statements or (b) result in material non-compliance by the Partnership and the Company with legal or regulatory requirements."

104.    Accordingly, in light of the misconduct alleged herein, each of the Audit Committee members have breached their obligations to Plains under the Audit Committee Charter and are conflicted from responding to any demand to assert the claims set forth herein.

105.    **Sixth**, each current Plains Board member faces a substantial likelihood of liability in both this Action and in pending and potential actions under Section 11, and could not fairly consider a demand.  Each of the Directors has signed certain SEC filings and/or Registration Statements made in connection with the public offering of shares of Plains which contained false statements.

106.    The Directors cannot reasonably be expected to defend Plains itself against allegations of misconduct in these actions while simultaneously pursuing these claims against officers, directors, and employees of Plains for the very same or substantially related misconduct. In light of the vast number of claims in the lawsuits seeking to hold Plains liable, it is not possible for the Board to impartially consider whether to bring these claims.  If the Company pressed forward with its rights of action against Defendants in this case, then the Company's efforts would undercut or even compromise the defense of the other lawsuits.

## CLAIMS FOR RELIEF

### COUNT I
### (Against Defendants for Breach of Fiduciary Duty)

107.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

108.    By reason of their fiduciary relationships, Defendants owed the Company and its unitholders the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

109.    Defendants, and each of them, violated and breached their fiduciary duties by, *inter alia*: (a) causing Plains to violate applicable law, disregarding their duties as fiduciaries;

(b) causing Plains to violate pipeline integrity measures and environmental laws and exposing the Company and its unitholders to unnecessary costs, fines, penalties, and tort liability; (c) exposing the Company and its unitholders to massive fines, penalties, and compensatory damages awards for violations of U.S. and state environmental laws; and (d) subjecting Plains to adverse publicity and loss of goodwill, greatly increased costs of capital, and impaired earnings.

110.    Defendants, in their roles as executives and/or directors of the Company, as well as the Defendant Entities, participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful conduct.

111.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, including the failure to maintain a system of internal controls adequate to insure the Company's compliance with all applicable laws, Plains has suffered significant damages, including a drastic diminution in its reputation, good will, and the value of its assets.

112.    As a result of the misconduct alleged herein, each Defendant is liable to the Company for the payment of money damages.

## COUNT II
### (Against the Individual Defendants for Waste of Corporate Assets)

113.    Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

114.    As a direct and proximate result of the wrongdoing alleged herein, Defendants have unreasonably and unnecessarily caused Plains to expend millions of dollars of corporate assets, and have subjected the Company to additional liability in the untold millions of dollars, to the extreme detriment of the Company.

115.    Additionally, as set forth above, the Individual Defendants have awarded themselves excessively lucrative compensation that has no reasonable basis, but instead is

designed only to enrich themselves in spite of their deceitful supervision of the Company and the Company's dismal performance.

116.     As a direct and proximate result of the Individual Defendants' waste of corporate assets as alleged herein, Plains has sustained damages.

### COUNT III
### (Against All Defendants for Contribution)

117.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

118.     The conduct of Defendants has exposed Plains to significant liability.

119.     Plains' liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts and omissions of Defendants.

120.     Plains is entitled to contribution and indemnification from each Defendant in connection with all such claims that have been, are, or may in the future be asserted against Plains by virtue of Defendants' wrongdoing.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.     Awarding money damages against all Defendants, jointly and severally, for all losses and damages suffered as a result of the misconduct complained of herein, together with pre-judgment interest, structured in a fashion to ensure that Defendants do not participate herein or benefit hereby.

B.     Directing Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their misconduct,

including all salaries, bonuses, fees, awards, options, and sale proceeds, and imposing a constructive trust thereon.

     C.     Directing Plains to take all necessary actions to reform and improve its corporate governance and internal procedures, including putting forward for a unitholder vote resolutions for amendments to the Company's articles of incorporation and by-laws, and taking other such actions as may be necessary to place before unitholders for a vote the following corporate governance policies:

1.    providing that the Company be governed by a board consisting of a majority of independent directors, including a lead independent director;

2.    strengthening the Board's supervision of operations and developing and implementing procedures for greater unitholder input into the policies and guidelines of the Board with respect to supervision of operations;

3.    establishing an environmental and litigation exposure oversight committee, staffed entirely by independent, non-executive directors and provided with adequate financial resources to retain independent counsel and advisors;

4.    permitting unitholders to nominate at least three candidates for election to Plains' Board of Directors;

5.    testing and strengthening the internal audit and control functions;

6.    controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments, including instituting a performance-based "delay and claw-back" policy, whereby the payment of bonuses and other incentive-based compensation to Company officers is delayed for a definite period, and/or is subject to return to the Company,

pending determination of whether the Company operated without serious environmental or litigation exposure for the period in question;

7.  requiring full compliance with Sarbanes Oxley; and

8.  permitting unitholders to question all executive directors of Plains at the annual general meeting and establishing a more transparent process for receiving and evaluating unitholder proposals.

D.  Awarding punitive damages.

E.  Declaring that Plains is entitled to contribution and indemnification from all Defendants.

F.  Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees.

G.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  December 15, 2015.

Respectfully submitted,


_____*/s/ Thomas E. Bilek*_____
Thomas E. Bilek
State Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720
tbilek@bileklaw.com

*Counsel for Plaintiff*

**OF COUNSEL:**

Lawrence P. Kolker
Correy A. Kamin
**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY  10016
Telephone: (212) 545-4600
Facsimile:  (212) 686-0114
Email: kolker@whafh.com
        kamin@whafh.com